Frank J. Wagner v. Commissioner.
Wagner v. Commissioner
Docket No. 4491-64.
United States Tax Court
T.C. Memo 1967-3; 1967 Tax Ct. Memo LEXIS 258; 26 T.C.M. (CCH) 8; T.C.M. (RIA) 67003; January 9, 1967
*258 Chester B. Griffin, P.O. Box 309, Fort Pierce, Fla., and Philip G. Nourse; for the petitioner. Glen W. Gilson II and George L. Hudspeth, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined that petitioner is liable for the following deficiencies in income tax, and additions to tax: Additions to Tax
I.R.C.
I.R.C.
1939
1954
Income
Sec.
Sec.
Sec. 294
Sec.
Sec.
Sec.
Year
Tax
291(a)
293(a)
(d)(1)(A)
6651(a)
6653(a)
6654(a)
1948
$ 34.00
$ 8.50
$ 1.70
1949
131.00
32.75
6.55
1951
43,353.24
10,838.31
2,167.66
$3,901.79
1953
51.00
12.75
2.55
1954
4,956.67
448.50
$1,239.17
$ 247.84
1955
6,682.24
1,670.56
334.11
$183.58
1956
4,363.98
1,091.00
218.20
118.66
1957
7,881.94
1,970.49
394.10
216.73
1958
26,002.98
6,500.75
1,300.15
724.12
1959
1,816.44
454.11
90.82
45.81
1961
141.41
1962
269.92 Petitioner no longer contests his liability for the deficiencies and additions to tax determined by the Commissioner for the years 1948 and 1949. A number of issues were raised by *259 the pleadings with respect to the Commissioner's determinations of deficiencies and additions to tax for the years 1951 through 1959 and 1961 and 1962. All of these issues, with one exception, have been settled by the parties or abandoned by the petitioner. The remaining issue relates to the Commissioner's determination that, based on unexplained bank deposits, petitioner had additional taxable income during each of the years 1951 through 1959. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioner became a resident of the State of Florida about 1946 and has since maintained his residence in that State principally in or in the vicinity of Fort Pierce, Florida. He did not file income tax returns for the years 1951 through 1959. During the periods from approximately December 27, 1948 to approximately June 16, 1952 and from approximately July 10, 1951 to approximately May 23, 1956, petitioner maintained two bank accounts, a special account and a regular account, in his name at the Florida Bank at Fort Pierce, Florida. During the period from approximately November 12, 1953 through approximately October 1, 1959, petitioner *260 also maintained a bank account at the St. Lucie County Bank, Fort Pierce, Florida. Petitioner was married to Marie C. Wagner on or about March 5, 1946, and divorced from her on or about January 23, 1957. In 1946 petitioner purchased an orange grove. The down payment amounted to $20,000, $16,000 of which came from petitioner's funds and $4,000 from funds of Marie C. Wagner. The balance of the purchase price was borrowed. During October 1946 the orange grove was sold and petitioner received net proceeds from the sale in the amount of $70,000 in currency after the payment of a $5,000 commission. He returned to Marie C. Wagner the $4,000 advanced by her and paid Federal income taxes on the sale to the district director of internal revenue for the district of New Jersey in the approximate amount of $5,311.20. The balance of approximately $60,000 will hereinafter be referred to as the orange grove money. During the years 1947 to 1951 petitioner purchased a personal residence which was sold in 1955 for $7,500, stock of the Standard Steel Corporation for approximately $20,000, 1,800 shares of common stock of Graham Paige Motors for approximately $5,000, and in the latter part of 1950 *261 or early 1951 land for $10,000 upon which three warehouses were subsequently built. In 1951 petitioner sold the 1,800 shares of stock of Graham Paige Motors. He realized no gain and sustained no loss on this sale. In 1951 petitioner started the construction of the first of three warehouses on the land he had purchased for $10,000. The construction was partially financed with orange grove money. Additional financing was obtained in 1951 by two loans made by petitioner from the Florida National Bank in Miami, Florida. The net proceeds of the first loan were paid to petitioner on July 9, 1951, by cashier's check No. 10829PF in the amount of $15,167.26, which was deposited on July 10, 1951 in petitioner's regular account at the Florida Bank of Fort Pierce, Florida. The net proceeds of the second loan were paid to petitioner on September 7, 1951 by cashier's check No. 11480 in the amount of $7,393.72, which was deposited on September 8, 1951 in his regular account at the same bank. The collateral for these two loans was petitioner's stock in the Standard Steel Corporation. During the years 1952 and 1953 petitioner made loans from the First Federal Savings and Loan Association of Vero *262 Beach, Florida, and used the proceeds of the loans to finance the construction of the second and third warehouses. The first loan in the amount of $12,000 was made on January 29, 1952. On May 26, 1952, when the balance due on that loan had been reduced by four monthly payments of $120 to $11,726.93, petitioner made the second loan in the amount of $25,000 and paid the balance then owing on the first loan. On July 24, 1953, when the balance due on the second loan had been reduced by 13 monthly payments of $250 to $23,105.87, petitioner made the third loan in the amount of $30,000 and paid the balance then owing on the second loan. During the period July 24, 1953 to July 23, 1958, petitioner made payments of $300 per month on the third loan, and on the latter date, when the amount due had been reduced to $16,796.91, he paid that amount to the bank. The first warehouse was 66 feet by 200 feet and was completed in the fall of 1951. The second warehouse was 50 feet by 160 feet, and was completed before the end of 1952. The third warehouse was 60 feet by 200 feet and was completed early in 1953. When the first warehouse was completed in 1951 petitioner put a tomato machine in the warehouse, *263 purchased tomatoes at the farmers' market auction at Fort Pierce, and made some sales of tomatoes in the latter part of 1951 and in 1952 and 1953. During the years 1952, 1953 and 1954 petitioner received some income from the rental of space in the first warehouse, and after the completion of the second and third warehouses in 1952 and 1953 he received income from the rental of space in those warehouses. Each warehouse was divided into sections or bays, and the rental received from the sections rented amounted to 50 cents per square foot per year. The first warehouse was sold by petitioner for $30,000 on November 23, 1954. The second and third warehouses were sold by petitioner for $67,000 on July 22, 1958. The proceeds of the 1954 sale of the first warehouse after deducting expenses, amounted to approximately $27,000. In 1955 petitioner entered into a farming venture on two farms. He invested the proceeds of the sale of the warehouse and also some money he had left over from selling lots in this venture. It was not successful and petitioner sustained a loss. Petitioner bought some land in 1954 from Riley Martin for approximately $40,000. This land was subdivided into lots, *264 and during the years 1954 through 1957 the lots were sold by petitioner. The lot sales were handled through a trustee bank account. During the year 1955, petitioner was engaged in the J. and W. Partnership and the E. and W. Partnership. During the year 1956, petitioner sold real property to Belle Gilson, E. Earl Kicliter and the Natural Gas Company of Florida (now called Southeastern Propane Gas Company) for $17,850, $2,500 and $1,500, respectively. When the second and third warehouses were sold for $67,000 in July, 1958, petitioner received a down payment of $6,700 and the balance on closing. After paying the balance of $16,796.91 due on his loan from the First Federal Savings and Loan Association and other expenses, the net proceeds amounted to $42,747.09. He received a check for this amount from the purchaser on July 22, 1958 and used that check to purchase four cashier's checks at the St. Lucie County Bank. Three of the checks were issued in the amount of $10,000 each, and one in the amount of $12,747.09. Petitioner arranged to have the $42,747.09 proceeds converted into cashier's checks because he had heard that his divorced wife was going to "get after" him to get some *265 more money. He cashed those checks on August 21, 1958, September 2, 1958, September 25, 1958 and November 1, 1958. Part of the cash received when he cashed the checks was deposited in 1958 in his account at the St. Lucie County Bank. In the latter part of 1958 petitioner purchased Dorwell's Restaurant for $38,000 and agreed to pay cash above two mortgages which he assumed. In connection with this transaction he drew checks on his account at the St. Lucie County Bank in the amount of $4,000 on November 12, 1958 for the deposit on the contract; in the amount of $2,403.50 on November 20, 1958 for recording the title costs; and in the amount of $16,056.99 on November 20, 1958 for the balance of the purchase price. In 1959 petitioner realized a profit from the operation of Dorwell's Restaurant. During the taxable years petitioner received cash in some transactions, and cashed checks received by him in others, and kept the cash in a drawer at his home. The maximum amount of cash ordinarily kept by him in the drawer during 1956 and prior years was about $5,000 or $6,000. In 1958, after he sold two warehouses, he "had quite a large sum of money on hand." In September, 1958, petitioner *266 bought ten acres of land from Charles and Elizabeth Moore and paid $2,000 or $3,000 cash for this land. During 1958, petitioner organized the North Dixie Realty Company, Inc., under the laws of Florida, and became the owner of 24,990 of the 25,000 authorized and outstanding shares of capital stock of this corporation. On or about November 20, 1958, the North Dixie Realty Company, Inc., purchased real estate for $40,519.69, of which $18,460.59 was paid at the closing. During 1958 or 1959 petitioner purchased 40 acres of land from Frank Brewer and Charley Moore for $20,000, of which approximately $5,000 was paid in cash. On January 23, 1959, petitioner paid to Thomson & McKinnon, stockbrokers, at their West Palm Beach office, the amount of $25,650 in cash for 250 shares of stock of General Motors Corporation and 250 shares of Bethlehem Steel Corporation. During the years 1951 through 1959 petitioner did not maintain adequate books and records reflecting the income realized by him during those years. In the absence of such books and records the Commissioner reconstructed his income for each year from specific transactions and from unexplained bank deposits. As the result of agreements *267 entered into by the Commissioner and petitioner the remaining issue, as already noted, relates to the determination of income made by the Commissioner based on unexplained bank deposits. During the year 1951 the following deposits were made to the special account of petitioner at the Florida Bank of Fort Pierce, Florida: Date
Amount
1-3
$ 48.45 *
1-23
99.17
1-23
750.00
2-3
48.25 *
2-8
500.00
3-1
48.05 *
3-6
360.00
3-17
609.60
4-2
47.85 *
5-2
47.65 *
5-4
2,093.00
6-2
47.45 *
6-15
550.00
6-30
47.25 *
7-5
1,996.20
7-20
250.00
8-2
46.80 *
8-3
.25 *
9-4
46.85 *
10-2
46.65 *
10-29
46.45 *
Total deposits
$7,729.92 The deposits marked with an asterik(*), totalling $521.95, were eliminated in the notice of deficiency in asserting additional income since they were identified as receipts of mortgage payments. The remaining deposits, totalling $7,207.97, represent income taxable to petitioner for the year 1951 not otherwise accounted for. During the year 1951 the following deposits were made to the regular account of petitioner at the Florida Bank of Fort Pierce, Florida: Date
Amount
7-10
$15,167.26
8-20
2,000.00 *
9-8
7,393.72
9-10
364.50
9-10
550.00 *
9-21
3,337.94 *
10-2
8,000.00
10-11
3,000.00
10-15
11,327.45
10-25
4,827.02
11-19
1,927.25 *
11-23
3,720.47 *
12-3
2,221.41 *
12-3
2,118.62 *
12-3
1,081.12 *
12-4
46.25 *
12-8
2,904.50 *
12-8
161.50 *
12-8
303.00
12-15
1,411.25 *
12-17
2,295.00 *
12-26
899.77 *
12-29
1,671.61 *
Total Deposits
$76,729.64
*268 The deposits marked with an asterisk (*) were eliminated in the notice of deficiency in asserting additional income since they were identified as representing money received by petitioner from the following sources: Date
Source
Amount
8-20
Transfer from special ac-
count
$ 2,000.00
9-10
Stock dividends
550.00
9-21
Partial proceeds from sale
of Graham-Paige Motors,
Inc. stock
3,337.94
11-19
Sale of tomatoes
1,927.25 **
11-23
Sale of tomatoes
3,720.47 *
12-3
Sale of tomatoes
2,221.41 *
12-3
Sale of tomatoes
2,118.62 *
12-3
Sale of tomatoes
1,081.12 *
12-4
Mortgage payment receipts
46.25
12-8
Sale of tomatoes
2,904.50 **
12-8
Sale of tomatoes
161.50 *
12-15
Sale of tomatoes
1,411.25 *
12-17
Sale of tomatoes
2,295.00 *
12-26
Sale of tomatoes
899.77 *
12-29
Sale of tomatoes
1,671.61 *
Total eliminations
$26,346.69
The deposits of $15,167.26 on July 10 and $7,393.72 on September 8 do not represent income to petitioner in 1951 since they represented money borrowed by him from the Florida National Bank. Of the *269 remaining deposits made by petitioner to his regular account at the Florida Bank during 1951, totalling $27,821.97, $5,000 thereof represents nontaxable orange grove money, but the remaining $22,821.97 represents income taxable to petitioner for that year not otherwise accounted for. The following deposits to the special account of petitioner at the Florida Bank during 1952 were eliminated from the notice of deficiency in asserting additional income reflected in unidentified deposits since they represented mortgage receipts: Date
Amount
2-4
$45.85
3-3
45.65
3-31
45.45
4-29
45.25
The following deposits were made to the regular account of petitioner at the Florida Bank during 1952: Date
Amount
1-3
$ 46.05 *
1-10
2,500.00 *
1-11
4,235.52
2-5
11,696.25 *
2-29
2,500.00 *
2-29
1,000.00 *
5-24
200.00
5-31
200.00
6-12
8,600.00
6-16
2,349.50
7-14
3,699.04 *
7-31
1,000.00
8-13
2,800.00 *
10-4
4,130.22
10-16
601.80
11-17
1,000.00 *
11-25
500.00
12-4
1,600.00
Total deposits
$48,658.38 The deposits marked with an asterisk (*) were eliminated in the notice of deficiency in asserting additional income reflected in *270 unidentified deposits since they were identified as representing money received by petitioner from the following sources: Date
Source
Amount
1-3
Mortgage payment receipts
$ 46.05
1-10
Rental income
2,500.00
2-5
Bank loan
11,696.25
2-29
Sale of grader
2,500.00
2-29
Sale of grader
1,000.00
7-14
Sale of tomatoes, Southeast-
ern Tomato Growers
3,699.04
8-13
Automobile loan
2,800.00
11-17
Rental income
1,000.00
Total eliminations
$25,241.34 The deposits of $8,600 on June 12, 1952 and $2,349.50 on June 16, 1952, do not constitute taxable income to petitioner since they represented money borrowed by him from the First Federal Savings and Loan Association of Vero Beach. The remaining deposits made by petitioner during 1952 to his regular account at the Florida Bank, totalling $12,467.54, represent income taxable to petitioner for that year not otherwise accounted for. The following deposits were made to the regular account of petitioner at the Florida Bank during 1953: Date
Amount
1-24
$ 1,806.50
3-9
200.00
3-13
2,500.00
5-9
1,696.95
5-9
1,500.00
7-20
6,574.98
10-13
1,172.27
Total deposits
$15,450.70 All *271 of these deposits, except the $200 deposit made on March 9, 1953 were eliminated in the notice of deficiency in asserting additional income since they were identified as representing money received by petitioner from the following sources: Date
Source
Amount
1-24
Rental income
$ 1,806.50
3-13
Rental income
2,500.00
5-9
Sale of tomatoes, Southeast-
ern Tomato Growers
1,696.95
5-9
Sale of tomatoes, Southeast-
ern Tomato Growers
1,500.00
7-20
Loan, Savings & Loan Assn.
6,574.98
10-13
Auto loan
1,172.27
Total eliminations
$15,250.70 The $200 deposit on March 9, 1953 represents income taxable to petitioner for the year 1953 not otherwise accounted for. The following deposits were made to the account of petitioner at the St. Lucie County Bank, Fort Pierce, Florida, during 1953: Date
Amount
11-12
$8,000.00
12-28
500.00
Total deposits
$8,500.00 The $8,000 deposit was eliminated in the notice of deficiency in asserting additional income since it represented money borrowed by petitioner from his sister-in-law. The $500 deposit represents income taxable to petitioner for the year 1953 not otherwise accounted for. The *272 following deposits were made to the regular account of petitioner at the Florida Bank during 1954: Date
Amount
1-15
$ 165.00
2-17
175.00
3-23
180.00
6-15
750.00
Total deposits
$1,270.00 In determining the deficiency for 1954, the Commissioner did not treat these deposits as income received by petitioner during that year. The following deposits were made to the account of petitioner at the St. Lucie County Bank during 1954: Date
Amount
1-4
$ 1,000.00
1-15
500.00
2-2
2,615.75 *
2-4
7,000.00 *
2-13
2,464.40 *
2-23
1,552.71 *
3-8
1,361.36
3-10
8,000.00 *
3-13
1,000.00 *
3-22
8,100.00 *
4-8
858.82
4-20
692.53 *
4-27
976.80
5-8
206.27
5-10
500.00
5-12
600.00
5-28
1,674.83 *
6-8
1,498.50 *
7-6
500.00
7-29
740.00
8-9
300.00
8-26
900.00
9-7
420.60
10-7
510.00
10-9
1,600.00
10-22
275.00
11-5
565.75
11-15
60.00
11-22
1,150.00
11-26
26,628.62 *
12-16
1,780.56
Total deposits
$76,032.50 In determining the deficiency for 1954 the Commissioner did not treat the deposits of $1,000 on January 4, and $500 on January 15 as income received by petitioner during that year, and the deposits marked *273 with an asterisk (*) were eliminated in the notice of deficiency since they were identified as representing money received by petitioner from the following sources: Date
Source
Amount
2-2
Rental income
$ 2,615.75
2-4
Sale of real estate
7,000.00
2-13
Sale of real estate
2,464.40
2-23
Sale of real estate
1,552.71
3-10
Sale of real estate
8,000.00
3-13
Sale of real estate
1,000.00
3-22
Sale of real estate
8,100.00
4-20
Sale of real estate
692.53
5-28
Sale of R.R. spur line
1,674.83
6-8
Bank loan
1,498.50
11-26
Partial proceeds, sale of two
warehouses
26,628.62
Total eliminations
$61,227.34 The remaining deposits made by petitioner to his account at the St. Lucie Bank during 1954, totalling $13,305.16, constitute income taxable to petitioner for that year not otherwise accounted for. The following deposits were made to the account of petitioner at the St. Lucie County Bank during 1955: Date
Amount
1-6
$ 153.96
1-14
300.00
1-18
700.00
2-1
500.00
2-11
1,000.00
2-25
329.60
2-28
300.00
3-8
400.00
3-14
230.00
3-18
300.00
3-29
702.73
3-31
1,500.00
4-4
300.00
4-7
201.15
4-9
900.00
4-22
400.00
4-25
300.00
5-2
900.00
5-16
1,300.00
6-1
1,930.72
6-2
3,017.39
6-3
100.00
6-14
68.42
9-1
2,000.00
9-17
500.00
10-13
500.00
10-24
500.00
11-1
16.11
11-11
3,500.00
11-29
1,000.00
12-14
100.00
12-15
100.00
12-20
1,400.00
12-29
1,500.00
Total deposits
$26,950.08
*274 $12,000 of these deposits had their source in receipts from rent and sales of lots and do not represent taxable income of petitioner for 1955 otherwise unaccounted for. The remaining deposits of $14,950.08 represent income taxable to petitioner for that year not otherwise accounted for. The following deposits were made to the account of petitioner at the St. Lucie County Bank during 1956: Date
Amount
1-7
$ 110.00
1-9
400.00
1-13
200.00
2-3
900.00
2-10
500.00
2-21
48.37
3-1
25.00
3-13
1,800.00
3-16
300.00
4-2
600.00
4-12
50.00
5-4
1,300.00
5-24
250.00
6-4
40.00
6-5
300.00
6-9
99.50
6-15
1,050.00
7-13
150.00
7-23
110.00
8-7
300.00
8-22
100.00
8-31
600.00
9-11
325.00
10-2
130.00
10-6
300.00
10-23
110.00
10-26
120.00
11-7
350.00
11-14
75.00
11-20
2,100.00
12-8
300.00
12-24
360.00
Total deposits
$13,402.87 $3,500 of these deposits had their source in receipts from rent and sales of lots and do not represent taxable income of petitioner for 1956 otherwise unaccounted for. The remaining deposits of $9,902.87 represent income taxable to petitioner for that year not otherwise accounted for. The following *275 deposits were made to the account of petitioner at the St. Lucie County Bank during 1957: Date
Amount
1-5
$ 350.00
1-16
220.00
1-23
100.00
2-5
300.00
2-7
100.00
2-23
110.00
3-2
25.00
3-9
500.00
3-12
850.00
3-23
80.00
4-8
300.00
4-13
50.00
4-23
100.00
5-7
1,200.00
5-29
3,950.00
6-7
100.00
6-18
520.00
7-1
100.00
7-9
300.00
7-18
250.00
8-8
550.00
8-19
$ 125.00
9-6
300.00
9-17
135.00
9-30
30.00
10-3
780.00
10-29
100.00
11-8
100.00
11-11
260.00
11-21
240.00
12-10
300.00
12-20
300.00
Total deposits
$12,725.00 $6,000 of these deposits had their source in receipts from rent and sales of lots and do not represent taxable income of petitioner for 1957 otherwise unaccounted for. The remaining deposits of $6,725 represent income taxable to petitioner for that year not otherwise accounted for. The following deposits were made to the account of petitioner at the St. Lucie Bank during 1958: Date
Amount
1-13
$ 540.00
1-16
50.00
1-22
50.00
2-17
300.00
2-19
125.00
3-18
300.00
3-21
200.00
4-14
1,100.00
4-15
300.00
5-6
466.67
5-17
300.00
5-19
700.00
5-29
500.00
6-11
167.50
6-21
360.00
6-30
100.00
7-23
500.00
7-24
150.00
8-21
747.09 *
9-2
2,000.00 *
9-6
650.00
9-25
120.00
10-4
100.00
10-18
400.00
11-1
3,000.00 *
11-12
4,000.00 *
11-17
100.00
11-20
19,000.00 *
12-3
200.00
12-8
450.00
Total deposits
$36,976.26
*276 The deposits marked with an asterisk (*) represent part of the proceeds of the sale of two warehouses and do not constitute taxable income to petitioner for 1958 otherwise unaccounted for. Of the remaining deposits, totalling $8,229.17, $2,500 had their source in receipts from rents and do not represent taxable income to petitioner for 1958 otherwise unaccounted for, and $5,729.17 represent taxable income to petitioner for that year not otherwise accounted for. The following deposits were made to the account of petitioner at the St. Lucie County Bank during 1959: Date
Amount
1-26
$1,400.00
2-6
400.00
3-2
200.00
3-2
1,000.00
3-13
500.00
3-20
900.00
4-7
900.00
4-27
40.00
5-1
65.00
Total deposits
$5,405.00 These deposits represent income taxable to petitioner for the year 1959 not otherwise accounted for. Opinion RAUM, Judge: Petitioner filed no income tax returns for the years 1951 through 1959 [1] and did not keep adequate books and records from which his taxable income for those years could be determined. An examination conducted by the Internal Revenue Service disclosed that he had various potential sources of income and that he had made bank *277 deposits amounting to $84,459.56 in 1951, $48,840.58 in 1952, $23,950.70 in 1953, $77,302.50 in 1954, $26,950.08 in 1955, $13,402.87 in 1956, $12,725 in 1957, $36,976.26 in 1958, and $5,405 in 1959. The deficiency determinations for these years were based in part upon income from identified sources and in part upon unexplained bank deposits. Because of agreements entered into by the parties, the only issue remaining in dispute relates to the Commissioner's determination that certain bank deposits made by petitioner during the taxable years represented taxable income. *278 Where a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded in any books and records maintained by him, determinations made by the Commissioner of income subject to tax on the basis of such deposits have been approved in many instances; moreover, it has been repeatedly held that a presumption of correctness attaches to such determinations and that the taxpayer has the burden of overcoming this presumption. , affirmed (C.A. 2), certiorari denied, ; ; (C.A. 6); (C.A. 5); (C.A. 3); (C.A. 6); (C.A. 4), affirming , certiorari denied . In determining the amount of petitioner's income subject to tax on the basis of unexplained bank deposits, *279 the Commissioner eliminated therefrom all deposits the source or nature of which he was able to identify. In addition the unexplained deposits for some of the years were also reduced by concessions made by the Commissioner in the course of the trial. An attempt was made at the trial to elicit from petitioner an explanation of the source or nature of the remaining deposits. But his testimony was vague, general, and unsatisfying. He appeared secretive to us, and we gained the distinct impression that he was uncooperative not only with the investigating agent but also with his own counsel. In the light of these circumstances and his failure to file returns over a long period of years, this is a case in which it is peculiarly appropriate to place the burden upon petitioner to show that his unexplained deposits did not in fact represent taxable income. [2] Yet his testimony was so vague and confusing as to be unconvincing in his sweeping assertions to the effect that these deposits did not reflect taxable income that was otherwise unaccounted for. We proceed to a consideration of these deposits, year by year, beginning with 1951. *280 In the notice of deficiency, the Commissioner included in petitioner's 1951 taxable income unexplained bank deposits aggregating $57,590.92. This amount was determined by eliminating from the total 1951 deposits of $84,459.56 deposits of $26,868.64 which were identified by the Commissioner. At the trial the Commissioner conceded that the deposits in petitioner's regular account of $15,167.26 on July 10, 1951 and $7,393.72 on September 8, 1951 reflected proceeds of a bank loan and did not, therefore, represent taxable income. As the result of these eliminations and concessions the remaining unexplained deposits for 1951 amounted to $35,029.94. Petitioner testified that these unexplained deposits came from the proceeds of the 1946 sale of an orange grove and from other funds he may have had amounting to $2,000 or $3,000. He stated that he "did not do nothing" in the years 1947 to 1950. During the period 1947 to 1951, he made several large purchases (listed in our findings) which, together with his living expenses, could have consumed a substantial part of the orange grove money and, according to his testimony, he used part of that money in 1951 to begin the construction of a warehouse. *281 How much, if any, of the orange grove money remained that petitioner could have deposited in his bank accounts in 1951 is not clear from the evidence. The unexplained 1951 deposits include many odd amounts, such as $99.17, $2,093, $1,996.20, $11,327.45 and $303, which could have had their source in income-producing transactions, and in the absence of some satisfactory explanation as to why deposits of such amounts were made in 1951 from orange grove money received in 1946, we are not convinced that that money was the source of all the unidentified 1951 deposits. On the other hand, there were some 1951 deposits in round figures and we are reasonably satisfied that some portion thereof did have its source in the orange grove money. The matter is not susceptible of any precisely accurate determination, but in accordance with the rationale of (C.A. 2), we have made a finding that $5,000 of the unidentified 1951 deposits in petitioner's regular account at the Florida Bank represented nontaxable orange grove money. Cf. , affirmed (C.A. 9); , *282 affirmed (C.A. 3); , affirmed (C.A. 7), certiorari denied ; , affirmed sub nom. (C.A. 7); , affirmed (C.A. 6). We hold that petitioner has failed to carry his burden of proof as to the remaining unidentified deposits for 1951, which amount to $30,029.94 for both the special and regular accounts. In the notice of deficiency, the Commissioner determined that $23,417.04 of the deposits totalling $48,658.38 made to the regular account of petitioner at the Florida Bank in 1952 represented taxable income. At the trial he conceded that deposits of $8,600 on June 12, 1952 and $2,349.50 on June 16, 1952 did not constitute taxable income for 1952 which left unexplained deposits for that year of $12,467.54. Petitioner testified that the source of those deposits was either rental money or receipts from sales of tomatoes. In determining the deficiency for 1952 the Commissioner included *283 in petitioner's income rental income of $2,280.40 and receipts from tomato sales of $3,699.04. In arriving at the amount of 1952 unexplained deposits the Commissioner eliminated rental income of $2,500 and receipts from tomato sales of $3,699.04. No evidence was produced by petitioner to establish error in these adjustments. In the circumstances petitioner has not sustained his burden of proving the source or nature of the unexplained 1952 deposits of $12,467.54 and we have reached the conclusion, and made a finding, that those deposits represented additional income subject to tax. In determining the amount of unexplained deposits to be included in petitioner's income for 1953, the Commissioner eliminated as identified all of the deposits made by petitioner to his regular account at the Florida Bank and to his account at the St. Lucie County Bank, with two exceptions, one being a deposit $200of in the regular account on March 9, 1953 and the other a deposit of $500 to his account at the St. Lucie County Bank on December 28, 1953. Petitioner testified that the source of these deposits was either receipts from rent or tomato sales. The Commissioner in determining the amount of unexplained *284 1953 deposits to be included in petitioner's income for that year eliminated rental income of $4,306.50 and receipts from the sale of tomatoes of $3,196.95. In the absence of any evidence showing that the 1953 rental income and receipts from tomato sales exceeded these amounts and were not otherwise taken into account in determining his taxable income, petitioner has not sustained his burden of proving that the Commissioner erred in including the two deposits totalling $700 in his taxable income for 1953. The Commissioner determined that unexplained deposits of petitioner totalling $13,305.16 represented taxable income for 1954. Petitioner testified that the sources of the unexplained deposits were rental income and receipts from sales of lots. In arriving at the amount of the 1954 unexplained deposits the Commissioner eliminated rental income of $2,615.75 and receipts from sales of real estate aggregating $28,809.64. No evidence was produced by petitioner showing that he had rental income and receipts from real estate sales otherwise accounted for in excess of these amounts which were deposited to his account at the St. Lucie County Bank in 1954. In these circumstances, in the absence *285 of any convincing evidence, establishing the source of the 1954 unexplained deposits of $13,305.16, the Commissioner's determination that they represented additional taxable income for that year must be, and is, approved. The Commissioner determined that all of the deposits made by petitioner to his account at the St. Lucie County Bank during 1955, 1956 and 1957 represented unexplained deposits includable in his taxable income for those years. They amounted to $26,950.08 in 1955, $13,402.87 in 1956, and $12,725 in 1957. Petitioner testified that the deposits in each of those years came from receipts from rental of warehouses and from sales of lots, but did not identify any particular deposit as coming from one or the other of these two sources. Although no evidence was produced by petitioner showing the amount of rental receipts and receipts from lot sales received by him in 1955, 1956 and 1957, the Commissioner in computing petitioner's gain or loss from specific transactions in each of those years determined that his rent receipts and receipts from lot sales were as follows: [3]
Rent Receipts
Lot Sales
1955
$1,800.00
$44,377
1956
1,200.00
6,445
1957
3,619.73
28,120
*286 Petitioner did not contest these determinations. Although we are unable to ascertain from the evidence the exact amount of the rent and lot sale receipts which were deposited by petitioner in his bank account in each of those years, the evidence convinces us that part of the deposits made by petitioner in each year came from those sources and that all of the deposits made in each year did not, therefore, represent taxable income otherwise unaccounted for. In the circumstances an allocation is appropriate, Cf. (C.A. 2), and we have made findings that $12,000 of the total 1955 deposits of $26,950.08, $3,500 of the total 1956 deposits of $13,402.87, and $6,000 of the total 1957 deposits of $12,725 had their source in receipts from rents and lot sales, otherwise accounted for in the Commissioner's determination, and that the remainder of the deposits made in each of those years represents *287 additional income taxable to petitioner. In determining petitioner's income from unexplained deposits for 1958, the Commissioner eliminated from the total deposits of $36,976.26 made to petitioner's account at the St. Lucie County Bank during that year a $2,000 deposit made on September 2, 1958 on the ground that it represented part of the proceeds received from the sale of two warehouses in 1958. At the trial the Commissioner conceded that deposits of $747.09 on August 21, $3,000 on November 1, and $4,000 on November 12 also represented part of the proceeds of that sale which should be eliminated. After a careful consideration of the evidence, we have found as a fact that a deposit of $19,000 on November 20 also represented part of the proceeds of that sale which should be eliminated from unexplained deposits. The two warehouses were sold on July 22, 1958 and prior to their sale in 1958 petitioner received rents which the Commissioner in the notice of deficiency determined to amount to $6,669.94. Petitioner did not contest this determination. Although petitioner did not identify any of the deposits made prior to July 22, 1958 as having their source in rental receipts, we are convinced *288 that part of them did have their source in such receipts. Since petitioner appears to have had a penchant for dealing in cash and keeping substantial amounts of cash on hand, we do not believe that he deposited all of the rents. On the other hand, it seems reasonable to conclude that he deposited some of them, and, following , we have found as a fact that deposits totalling $2,500 in 1958 had their source in rental receipts otherwise accounted for. The end result of our findings as to 1958, together with the Commissioner's elimination and concessions, is that petitioner had net unexplained bank deposits in that year in the amount of $5,729.17 which represented additional income taxable to petitioner for that year. The deposits made by petitioner to his account at the St. Lucie County Bank during 1959 totalled $5,405. Petitioner's testimony as to the source of these deposits was vague and uncertain. In the circumstances, the Commissioner's determination that they represented taxable income is approved. Decision will be entered under Rule 50. Footnotes
**. Receipts from Springfield Tomato Company, Inc.↩
*. Receipts from Becam Tomato Corporation. ↩
1. Petitioner complains on brief that there is no evidence to support a proposed finding that he did not file income tax returns for these years. However, the Commissioner's determination of deficiency stated that no such returns were filed, and petitioner, who bore the burden of proof, presented no evidence to establish that he filed any. Also, an addition to tax was determined by the Commissioner for each of the years based upon failure to file income tax returns, and the parties have stipulated (par. 51) that petitioner does not contest the addition to tax except that the amounts thereof are to be computed under Rule 50 on the basis of the deficiencies to be determined by this Court. The argument that the record fails to support a finding that no returns were filed is frivolous.↩
2. Petitioner's contention, made for the first time in his reply brief, that it is unconstitutional to place the burden of proof upon him comes too late. In any event, however, there is no substance to the point, which, if accepted, would require disapproval of a long line of cases including those cited above.↩
3. The figures relating to "rent receipts" appear in the "statement" accompanying the deficiency notice, and the figures relating to "lot sales" appear in "Schedule A" to that statement. That schedule is entitled "Schedule of Sub Division Sales."↩